# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER MILAM,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:07CV00021 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Charles L. Bledsoe, Jonesville, Virginia, for Plaintiff; Theresa Casey, Special Assistant United States Attorney, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Christopher Milam filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433, 1381-1383(f) (West 2003 & Supp. 2008). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff applied for DIB and SSI on June 7, 2005, alleging disability beginning May 9, 2005, due to the amputation of his left foot following a hunting accident and back and neck pain.[1] (R. at 32, 40-41.) The claims were denied initially on September 15, 2005 (R. at 28, 267-70), and upon reconsideration on January 30, 2006 (R. at 27, 274-77).

On February 28, 2006, the plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (R. at 29.) A hearing was held on October 4, 2006. (R. at 278-316.) The plaintiff, who was present and represented by counsel,

---

[1] The plaintiff lists his disability onset date as May 9, 2005, when he was injured in the hunting accident. (R. at 32, 38, 41.) Hospital records indicate that his accident actually occurred on May 7, 2005. (R. at 128.) During his adminsiatrative hearing the plaintiff clarified that he was seeking disability from the date of his accident, May 7, 2005. However, because the ALJ's opinion and the plaintiff's Motion for Summary Judgment both list the onset date as May 9, 2005, I will do the same.

Case 2:07-cv-00021-JPJ-PMS   Document 19   Filed 08/22/08   Page 2 of 21   Pageid#: 54

testified at the hearing.  (*Id.*)  By decision dated October 23, 2006, the ALJ denied the plaintiff's claims for DIB and SSI.  (R. at 12-21.)

The plaintiff then filed a request for review with the Social Security Administration's Appeals Council ("Appeals Council") on December 1, 2006 (R. at 8), but by a notice dated March 2, 2007, the Appeals Council denied the plaintiff's request for review (R. at 5-7).  Thus, the ALJ's opinion constitutes the final decision of the Commissioner.  The plaintiff then filed a complaint with this court objecting to this final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues.  The case is now ripe for decision.

II

The summary judgment record reveals the following facts.  The plaintiff was thirty-two years old at the time of the ALJ's decision, making him a younger individual under the Commissioner's Regulations.  *See* 20 C.F.R. § 416.963(c) (2008).  He has a high school education and past work experience as a carpenter's helper, a logger, a grocery store stocker or bagger, a tree trimmer, and a machine operator.  (R. at 41-42, 46, 284-88, 306-07.)

In May 2005, the plaintiff was involved in an unfortunate hunting accident that resulted in the amputation of his left foot. (R. at 40-41.) The plaintiff was admitted to the Wellmont Holston Valley Medical Center with a shotgun wound. (R. at 128.) He suffered multiple fractures of the metatarsal and tarsal bones as well as damage to the soft tissue, nerves, and arteries in the foot. (*Id.*) His surgeon, Daniel F. Klinar, M.D., attempted to save the foot, debriding and irrigating the wound three times, stabilizing the fractures, and amputating two toes before finally amputating the entire foot on May 13, 2005. (*Id.*) He was discharged on May 19, 2005, and Dr. Klinar noted that the "wound was healing well." (*Id.*)

After several months of satisfactory progress, the plaintiff was able to walk with crutches and was fitted with a prosthesis (R. at 162, 220, 241), however Dr. Klinar noted that the plaintiff was having problems adjusting to the loss of his foot and referred him for a psychological evaluation (R. at 221-22). By October 2005, the plaintiff could ambulate independently, had a full range of motion in his extremities, and could perform all activities of daily living without assistance, but had developed pain and an ulcer from wearing his prosthesis and reported that he experienced pain while chopping wood. (R. at 190, 220.) Dr. Klinar's treatment plan for the plaintiff included several prescription pain medications and a prescription muscle relaxant. (R. at 220.)

-4-

The plaintiff experienced back and neck pain before[2] and after his accident and received treatment at the Lee Regional Medical Center and from John Litton, M.D., between April and December 2005. (R. at 190, 194, 198, 224-29.) Dr. Litton's treatment notes indicate that the plaintiff characterized his back pain as mild in severity, dull, aching, and cramping, while his neck pain was moderate in severity, constant and sharp. (R. at 226, 229, 232, 235, 237, 240, 244, 247.) As a result of this pain, the plaintiff had a reduced range of motion in his back and neck. (R. at 225, 228, 231, 234, 241, 245, 248.) X rays revealed mild scoliosis in the plaintiff's lumbar spine and a congenital partial fusion between the second and third discs of the cervical spine, but no other abnormalities. (R. at 149, 195, 205.) To address the plaintiff's pain, Dr. Litton recommended bed rest, hot and cold packs, massage, back

---

[2] Although the plaintiff states in his application that his back and neck pain began in 2002 (R. at 41), medical records indicate that his back pain actually began a decade earlier, either in 1992 or 1993, and his neck pain began later, in 2003 or 2004. The plaintiff told licensed psychological evaluator Donna Abbott, M.A., and chiropractor, Dan Levesque, D.C., that his lower back pain began in 1992 after an accident where roof rafters fell on him while he was visiting a cattle market. (R. at 163, 167, 250.) Records from John Litton, M.D., and the Lee Regional Medical Center state that this accident, and the onset of the resulting lower back pain, occurred in 1993. (R. at 202, 226, 229, 232, 235, 237, 240, 244, 247.) The origin of the plaintiff's neck pain is less clear. Dr. Litton's notes indicate that while the plaintiff's neck pain began in 2003, the "precipitating event" was the 1993 accident at the cattle market. (R. at 244, 247.) However, the plaintiff told Dr. Levesque that his neck pain is the result of a neck injury or pinched nerve he sustained in 2004 while working in tree removal. (R. at 250.) The ALJ did not clarify this discrepancy in the hearing (R. at 294), but assumed that both the plaintiff's back and neck pain began in 1992 (R. at 16). In any case, it is clear that by the time of the plaintiff's hunting accident and foot amputation, the plaintiff had been living with lower back pain for over a decade and neck pain for at least a year.

-5-

strengthening exercises, weight loss, smoking cessation, and over-the-counter pain medications. (R. at 224, 227, 230, 234, 238-39, 249.) After the plaintiff's hunting accident and amputation, his treatment plan also included several prescription pain medications, as well as prescription medications for depression and anxiety, muscle relaxation, and smoking cessation. (R. at 225, 228, 231, 233-34, 238-39, 241, 245.) Treatment records from a visit to the Lee Regional Medical Center indicate that the plaintiff could ambulate independently and perform all activities of daily living without assistance. (R. at 190.) He denied any musculoskeletal pain, numbness or tingling, and on discharge stated that his pain level was a zero on a one to ten scale. (*Id.*) Medical staff noted that he had a full range of motion, no swelling or deformity, and no ecchymosis or discoloration due to ruptured blood vessels, and that his distal pulses were intact. (*Id.*)

On August 10, 2005, state agency physician, Donald R. Williams, M.D., completed an assessment of the plaintiff's physical residual functional capacity. (R. at 155-161.) He determined that the plaintiff could lift up to twenty pounds occasionally and ten pounds frequently and could stand or walk for up to six hours and sit for up to six hours during an eight-hour workday, but could not push or pull with his left lower extremity due to his amputation. (R. at 156.) He opined that the plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or

-6-

crawl, but could never climb ladders, ropes, or scaffolds, and must avoid even moderate exposure to hazards, such as machinery and heights. (R. at 157-58.) He identified no other limitations. (*Id.*)

On September 8, 2005, the plaintiff was seen by licensed psychological examiner, Donna Abbott, M.A. In describing his activities of daily living for Abbott, the plaintiff stated that he spends about six to seven hours a day sitting, that he does not attend church or go to any regular activities, that he does not have a driver's license, that he cannot lift a dinner plate, but that he can shower and dress by himself and can walk with crutches. (R. at 164-65.) Abbott diagnosed the plaintiff as having an adjustment disorder and depressed mood as a result of losing his foot (R. at 166-67) and intellectual functioning in the borderline range (R. at 165-66). His global assessment of functioning (GAF) score was fifty-five (R. at 166), indicating that he may have "moderate symptoms or moderate difficulty in social or occupational functioning," *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 32 (Am. Psychiatric Ass'n 4th ed. 1994). Abbott opined that the plaintiff would "benefit from individual counseling" and "[w]ith appropriate treatment, some improvement in his depression is possible." (R. at 167.)

On September 12, 2005, state agency psychologist, Julie Jennings, Ph.D., reviewed the record medical evidence and completed an assessment of the plaintiff's

mental residual functional capacity and an accompanying psychiatric review technique form, both of which were reviewed and affirmed by another state agency psychologist, E. Hugh Tenison, Ph.D. (R. at 170-85.) Jennings determined that the plaintiff was not significantly limited in his ability to remember locations and work-like procedures; to understand, remember, and carry out short and simple instructions; to work in coordination with or proximity to others without distraction; to make simple work-related decisions; and to ask simple questions or request assistance. (R. at 170-71.) She determined that the plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions for psychologically-based symptoms; to perform at a consistent pace without an unreasonable number or length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (*Id.*) Based on the medical evidence, Jennings

-8-

also found that the plaintiff had the medically determinable impairments of an adjustment disorder with depressed mood and borderline intellectual functioning. (R. at 172-73, 176-77). Jennings opined that the plaintiff's statements were only partially credible and found that the plaintiff "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." (R. at 172, 185.)

On April 18, 2006, the plaintiff saw chiropractor, Dan Levesque, D.C., for an initial examination and evaluation. (R. at 250-258.) Much of Dr. Levesque's report consists of a recitation of the plaintiff's subjective statements regarding his pain and restrictions on his activities of daily living—the plaintiff describes back, neck, left arm and hand, and left leg pain, as well as migraine headaches, and loss of grip strength that makes it difficult for him to perform activity related to self care and personal hygiene, certain types of physical activity, and travel. (R. at 250-53.) Specifically, the plaintiff told Dr. Levesque that his pain makes it "virtually impossible" for him to stand, walk, drive or ride in a car for long periods, sit continuously, stoop, squat, kneel, use a computer or typewriter, or hold and identify objects by touch. (R. at 252-53.) He also related that, despite marked pain, he can stand, walk, sit, or drive or ride in a car for shorter durations (up thirty minutes); is able to carry small objects, climb stairs, push while sitting or standing, but only with

-9-

help; and has a limited ability to write and grasp things with his hands and fingers. (*Id.*)

Dr. Levesque performed diagnostic tests to evaluate the plaintiff's neurological and orthopedic state, including X rays, range of motion studies, and nerve and trigger point tests. (R. at 253-57.) He determined that the plaintiff suffered from osteoarthritis, degenerative disc disease, possible carpal tunnel syndrome, chronic fatigue, pain and weakness in his grip, back, and legs. (R. at 257-58.) Dr. Levesque opined that "it is unlikely that [the plaintiff] will ever fully recover his health or daily living activities" and he "has lost the ability to provide for himself financially or otherwise and should qualify for total disability assistance." (R. at 258.)

The evidence in this case also consists of the plaintiff's testimony at the administrative hearing on his past work experience, the hunting accident that resulted in the loss of his foot, and his continuing medical issues. (R. at 283-304, 306-07.) With respect to his medical issues, the plaintiff stated that because of problems tolerating his prosthesis, he would be having several more inches of his lower left leg removed so that he could use a different type of prosthesis. (R. at 292-93, 301-02.) When asked by the ALJ about his other impairments, the plaintiff stated that he had back problems, depression and "nerves," but did not mention any neck pain. (R. at 294, 301.) He described being able to go grocery shopping and use a push lawn

mower, but for shorter durations than he was previously able, and to climb stairs with the aid of a handrail. (R. at 294-96, 301.) He also stated that he was able to toss a "wiffle ball" and go fishing with his young son and attend church and his son's school functions. (R. at 295-96, 298-301.)

A vocational expert also testified at this hearing. (R. at 304-315.) He classified the plaintiff's past relevant work, determining that he had worked in jobs that were unskilled, semi-skilled, and skilled, and that had required light, medium, heavy, and very heavy levels of exertion. (R. at 307-08.) The ALJ asked the vocational expert to consider various hypothetical situations, including whether jobs existed in significant numbers for an individual the same age as the plaintiff, with his same education and background, who was restricted to a limited range of sedentary work. (R. at 308-15.) Specifically, the ALJ limited the physical abilities of this hypothetical individual to lifting and carrying up to twenty pounds occasionally and ten pounds frequently; standing or walking with normal breaks for a total of two hours in an eight-hour workday; and sitting with normal breaks for a total of six hours in an eight-hour workday. (R. at 309, 314.) He further specified that this hypothetical individual would be precluded from using his left lower extremity in pushing or pulling; must avoid climbing ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; and must

-11-

avoid exposure to hazards such as dangerous machinery and unprotected heights. (*Id.*)

With respect to mental abilities, the ALJ asked the vocational expert to assume that this hypothetical individual would have a moderate limitation in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions for psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 311-12.) This hypothetical individual would have no significant limitation in the ability to remember locations and work-like procedures; to understand, remember, and carry out simple instructions; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; and to ask simple questions or request

-12-

assistance—that is, "the individual should be able to meet the basic mental demands of competitive work on a sustained basis." (R. at 312.)

In response, the vocational expert concluded that the hypothetical individual would be unable to return to any of the work previously performed by the plaintiff. (*See* R. at 310.) The vocational expert identified several jobs that could be performed by such an individual, including that of pharmaceutical assembler, for which there are 157,000 positions nationally and 9,600 regionally; security surveillance monitor, for which there are 114,000 positions nationally and 6,200 regionally; and hand packer, for which there are 67,000 positions nationally and 4,600 regionally. (R. at 314-15.)

## III

A plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. A plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423 (d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB and SSI claims. The Commissioner considers whether the claimant (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. § 416.920(a)(4) (2008). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id*.; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute

its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

After considering the treatment records and opinions of medical professionals, a report from the plaintiff's chiropractor, and testimony of the plaintiff and the vocational expert, the ALJ determined that the plaintiff retained the residual functional capacity to perform a significant number of jobs, requiring only sedentary work, in the national economy, and was, thus, not disabled. (R. at 15-21.) He found that the plaintiff's amputation of the left foot, mild scoliosis of the lumbar spine, depression, and borderline intellectual functioning constitute severe impairments, but that these do not meet or equal the severity of any listed impairment. (R. at 17, 20.) In assessing the plaintiff's residual functional capacity, the ALJ determined that the plaintiff was able to lift or carry up to twenty pounds occasionally and ten pounds frequently, to sit for up to six hours and stand or walk up to two hours in an eight-hour workday, and to occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but that he could not push or pull using his left leg, climb ropes, ladders, or scaffolds, or work in hazardous areas. (R. at 19-20.) He further found that the plaintiff is restricted to tasks with simple instructions. (*Id.*) Because of these limitations, the plaintiff does not retain the capacity to return to his past work, but

-15-

could perform a significant number of sedentary jobs, including pharmaceutical assembler, security surveillance monitor, and hand packer. (R. at 20-21.) In reaching his decision, the ALJ found that the plaintiff's testimony "was not fully persuasive regarding his symptomatology and resulting limitations." (R. at 20.)

The ALJ's determination of the plaintiff's residual functional capacity and that the plaintiff can perform certain sedentary occupations in the national economy and is not disabled is supported by substantial evidence. The residual functional capacity articulated by the ALJ is almost identical to the recommendations of the state agency physicians and largely consistent with the observations of the plaintiff's treating physicians. With respect to the plaintiff's physical abilities, the ALJ adopted Dr. Williams' recommendations except that he determined that the plaintiff was only able to stand or walk for two hours in an eight-hour workday, rather than six hours. This is supported by the observations of the Lee Regional Medical Center staff who noted that in October 2005, the plaintiff was able to ambulate independently and perform all activities of daily living without assistance, denied having any musculoskeletal pain, numbness or tingling, and had a full range of motion. This is also supported by the conservative treatment regimen advanced by Dr. Litton, which included pain medication, but also at home treatments such as hot and cold packs, massage, and back strengthening exercises. While Dr. Klinar reported that the plaintiff was

experiencing pain using his prosthesis, the additional surgery and new prosthesis described by the plaintiff at his hearing should address that problem. With respect to the plaintiff's mental abilities, the limitations described by the ALJ to the vocation expert at the hearing are identical to those prescribed by state agency psychologists, Jennings and Tenison, and consistent with the observations of licensed psychological evaluator, Abbott. Based on these physical and mental limitations, the vocational expert identified several jobs that could be performed by a person with the plaintiff's background and impairments and exist in significant numbers in the national economy. Thus, the ALJ's decision to adopt these findings and his determination that the plaintiff was not disabled within the meaning of the Act were supported by substantial evidence.

The plaintiff contends that the ALJ erred in not giving sufficient weight to the opinion of his chiropractor, Dr. Levesque, and in discrediting the plaintiff's testimony as to the intensity and degree of his pain. (Pl.'s Br. Supp. Mot. Summ. J. 8.)

As the plaintiff concedes, social security regulations do not allow chiropractic opinions to be considered as or given the same weight as opinions from acceptable medical sources. (*Id.*) 20 C.F.R. §§ 404.1513(a), 416.913(a) (2008). The plaintiff argues that the ALJ should have at least considered Dr. Levesque's opinion as lay witness testimony. (Pl.'s Br. Supp. Mot. Summ. J. 8.) In fact, the ALJ did consider

Dr. Levesque's opinion as evidence from "other sources," but determined that it was entitled to little weight because Dr. Levesque had only seen the plaintiff once before rendering his opinion and because his opinion was inconsistent with the rest of the medical evidence and the plaintiff's reported activities of daily living. (R. at 17.) 20 C.F.R. §§ 404.1513(d), 416.913(d); Soc. Sec. Rul. ("SSR") 06-03p, 2006 WL 2329939, at *2-5 (explaining that the weight given an opinion from an "other source" is based on several factors, including "[h]ow long the source has known and how frequently the source has seen the individual" and "[h]ow consistent the opinion is with other evidence").

Dr. Levesque opined that the plaintiff could not stand for more than thirty minutes or walk or sit for more than fifteen minutes at a time, grasp, lift, carry or hold objects heavier than ten pounds, or use his hands for any fine motor skills. Despite this, the plaintiff reported that he spends about six to seven hours a day sitting, attends church and his son's school functions, mows his mother's lawn using a push mower, does grocery shopping, and chops wood. Further, treatment notes from the Lee Regional Medical Center indicate that the plaintiff could ambulate independently and perform all activities of daily living without assistance and had a full range of motion. Given its inconsistency with the rest of the evidence, I find that the ALJ did not err in according Dr. Levesque's opinion little weight.

-18-

The plaintiff also argues that the ALJ erred by incorrectly assessing pain as a limiting factor in plaintiff's ability to work. (Pl.'s Br. Supp. Mot. Summ. J. 8.) The plaintiff correctly states that once a medically determinable impairment that could reasonably be expected to produce such pain is established, subjective evidence of the intensity, persistence, and limiting effects of the pain can be used to support a finding of disability. (*Id.* at 9.) 20 C.F.R. §§ 404.1529, 416.929 (2008); SSR 96-7p, 1996 WL 374186, at *1. This requires the ALJ to assess the credibility of the plaintiff's subjective statements by evaluating their consistency both internally and with other information in the case record. SSR 96-7p, 1996 WL at *1, 5. In addition to relying on objective medical evidence when assessing the credibility of the plaintiff's statements, the ALJ considers factors such as the plaintiff's activities of daily living; location, duration, frequency, and intensity of the pain; precipitating or aggravating factors; medications taken; and any treatment or other measures the plaintiff uses to relieve pain. *Id.* at *3.

The ALJ considered these factors and determined that the plaintiff's testimony regarding his pain and its limiting effects was not fully persuasive. (R. at 18-20.) The ALJ noted that he had considered the aggravating impact of standing and walking on the sores and ulcers caused by the plaintiff's prosthesis, which was why he had determined that the plaintiff should not stand or walk more than two hours in

-19-

a workday, but observed that this should improve after he receives his new prosthesis. (R. at 18.) He also considered the plaintiff's reported activities of daily living and the observations of his treating and examining physicians. (*Id.*)

The ALJ did not err in finding the plaintiff's subjective statements of pain not fully credible. While the prescription pain medications being taken by the plaintiff and the need for additional surgery and a new prosthesis, provide some support for the plaintiff's allegations of pain, these are belied by the plaintiff's dramatically inconsistent reports of his activities of daily living. At his hearing, the plaintiff reported being able to climb stairs with the aid of a handrail, go grocery shopping, use a push mower, go fishing and play wiffle ball with his son, and attend church and his son's school functions. At a medical visit to the Lee Regional Medical Center he reported being able to ambulate independently and perform all activities of daily living and denied all musculoskeletal pain or numbness. He reported to Dr. Klinar that he was able to chop wood, but that it aggravated his leg pain and he told licensed psychological evaluator Abbott that he typically spends six to seven hours each day sitting and that he retained the ability to shower and dress by himself. Yet, he reported to Dr. Levesque that he could not sit for extended periods of time, could not climbs stairs without help, and had difficulty holding and grasping objects with his hands or fingers, and had difficulties with activities related to self-care and hygiene.

He also reported to Abbott that he could not even hold a dinner plate. In fact, in reviewing the medical evidence before her, state agency psychologist Jennings also felt that the plaintiff's statements were only partially credible. These inconsistencies are not easily explained by the passage of time or any other facts on the record, nor does the plaintiff offer any explanation. In light of these dramatic inconsistencies, I find that the ALJ did not err in finding the plaintiff's testimony only partially credible.

I therefore find no error in the ALJ's decision that the plaintiff is not disabled within the meaning of the Act.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: August 22, 2008

/s/ JAMES P. JONES
Chief United States District Judge

-21-